UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAYDEN SUNDBERG,<br><br>Plaintiff,<br><br>v.<br><br>SHELTON SCHOOL DISTRICT NO. 309,<br><br>Defendant. | CASE NO. 3:23-cv-05717-JNW<br><br>ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT |

## 1. INTRODUCTION

Jayden Sundberg attended Shelton High School as a special-education student. He has autism, ADHD, and intermittent explosive disorder, and the behavior plan the school wrote for him warned that he was likely to respond physically if someone mocked him and he could not walk away. He is also gay. In September 2021, he told school staff several times that other students were calling him a “fag” or “faggot.” No one completed the form that Shelton’s anti-bullying policy requires. Days later, a student who had used that slur stabbed him six times. Shelton then decided Sundberg would not return—first citing residency paperwork,

and later, through its Rule 30(b)(6) designee, the very behaviors his special-education plan was written to address.

Sundberg sues Shelton School District No. 309 for sexual orientation and disability discrimination under the Washington Law Against Discrimination (WLAD), disability discrimination under Title II of the Americans with Disabilities Act, and negligence. Both sides move for partial summary judgment. Dkt. Nos. 75, 76. The Court DENIES Shelton's motion and GRANTS Sundberg's motion in part. The undisputed record establishes that Shelton excluded Sundberg from school and that the elements of his claims that don't turn on motive are met. Whether Shelton acted because of his disability, and whether it acted with deliberate indifference, are questions for the jury. So is how Shelton handled his reports of harassment.

## 2. BACKGROUND

### 2.1 Sundberg's disabilities and his behavior plan.

Sundberg openly identified as queer/gay and gender fluid while at Shelton. Dkt. No. 78 ¶ 3; Dkt. No. 77 at 35 (Dhamers 30(b)(6) Dep. 142:11–16). He has been diagnosed with "Autism Spectrum Disorder/Asperger's Syndrome, Intermittent Explosive Disorder ('IED'), and Attention-Deficit/Hyperactivity Disorder." Dkt. No. 78 ¶ 2; Dkt. No. 77 at 41–42 (Dhamers 30(b)(6) Dep. 156:13–15, 158:13–16). He came to Shelton High School in December 2019 because the district concluded it could better support his behavioral needs than its alternative school could. Dkt. No. 77 at 67. Shelton adopted the Individualized Education Program ("IEP") and Behavior Intervention Plan ("BIP") from his prior district and updated them in

December 2020 and again in May 2021. *Id.* at 29 (Dhamers 30(b)(6) Dep. 112:6–17); *id.* at 77–80.

The BIP identifies the behavior it targets: Sundberg "reacts quickly and strongly to what he perceives as unfair or rude behavior from others," which can produce "blow ups, intense and disruptive outbursts, and a rude attitude toward authority." *Id.* at 79. It identifies the replacement behavior: "We have been working on Jayden walking away to a place where he is safe to express his feelings without punishment[.]" *Id.* It tells staff that when he is triggered, "Jayden will chose [sic] to leave quietly and come to EBD [Emotional and Behavioral Disorders] teacher to decompress," and that teachers may "ask him to take a walk to calm down." *Id.* at 80. And every version of the BIP contains this warning:

> In a social setting where Jayden feels he is being, mocked, belittled, or disrespected he will verbally challenge the person he feels offended by. If the person is not willing to listen and talks down to Jayden (as he perceives it), he will quickly escalate verbally. If he does not or is not allowed to walk away, he may become physical. If the other person actually presses the escalation, Jayden is likely to respond physically in order to show all that he is worthy of respect and won't tolerate abuse.

*Id.* at 79. On September 10, 2021, Sundberg's special-education teacher emailed the IEP and BIP to his teachers, both assistant principals, and the school security officer, with the expectation that they would read the documents within a day or two. *Id.* at 16–17, 21–22 (Dhamers 30(b)(6) Dep. 22:10–20, 24:1–16, 30:14–31:3).

**2.2 Shelton's harassment, intimidation, and bullying policy.**

Shelton's policies prohibit discrimination based on sexual orientation and disability, and they prohibit harassment, intimidation, or bullying (HIB) based on those characteristics and on weight. *Id.* at 82, 84. The policy's procedures require staff to intervene when they witness or receive reports of HIB. *Id.* at 91. Shelton's Rule 30(b)(6) designee testified that an employee who learns of potential teasing based on a student's sexual orientation or disability has no discretion: "They have to report it." *Id.* at 106–07 (Kipper 30(b)(6) Dep. 20:23–21:3). A report is made on an incident reporting form, which starts an investigation. *Id.* at 92–95; *see id.* at 137–39 (Bryz-Gornia Dep. 26:13–28:6).

**2.3 The September 14 fight and Sundberg's report about L.D.**

On September 13, 2021, Sundberg learned that a student, L.D., had called him a "fat gay kid" and said he didn't know how to fight. Dkt. No. 81 at 8 (Sundberg Dep. 48:11–20). Sundberg texted L.D. that night, "instigated the problem" by his own account, and confronted L.D. at school the next day. *Id*. He also texted a friend from the district's alternative school, C.C., who came to campus and fought L.D. that afternoon. *See* Dkt. No. 75 at 5–6, 171; Dkt. No. 80 at 3.

Assistant Principal John Bryz-Gornia investigated. He spoke with L.D. and L.D.'s guardians but not with Sundberg or Sundberg's guardian. Dkt. No. 77 at 140, 148 (Bryz-Gornia Dep. 31:9–17, 48:20–24). On September 15, he emailed other administrators and Sundberg's special-education teacher that, "[r]egardless of his Special Education status," he "highly recommend[ed]" documenting Sundberg as the

bully, an emergency expulsion, a behavior contract, and “alternative plans for credit retrieval.” *Id.* at 173; *see id.* at 146–47 (Bryz-Gornia Dep. 45:4–47:5). The next day he completed a HIB form naming Sundberg as the “bull[y],” stating that Sundberg “promoted a fight” because he “does not like” L.D., and that a “Facebook video proves premeditation.” *Id.* at 171; *see also id.* at 144 (Bryz-Gornia Dep. 43:19–24). He later admitted he never saw the video and that, when he wrote the email, he had “no evidence” connecting Sundberg to C.C.’s decision to fight. *Id.* at 144, 149 (Bryz-Gornia Dep. 43:11–14, 49:8–12).

On September 17, Assistant Principal June Dhamers interviewed Sundberg. Dkt. No. 34 ¶ 8. He told her that L.D. had called him a “fat gay dude” and had pointed and stared at him. *Id.* ¶ 12; *accord* Dkt. No. 77 at 38 (Dhamers 30(b)(6) Dep. 151:17–20); *see also* Dkt. No. 53 ¶ 1.2 (admitting that Plaintiff told high school personnel). No one completed a HIB form on that report, investigated L.D., or took corrective action. Dkt. No. 77 at 24–26 (Dhamers 30(b)(6) Dep. 68:2–6, 70:8–19, 72:5–8, 17–23); *id.* at 149–50 (Bryz-Gornia Dep. 49:13–50:5). Dhamers concluded that Sundberg should not be disciplined and began planning an IEP meeting to identify more support for him. Dkt. No. 34 ¶¶ 16–17. No one was disciplined for the September 14 fight. *Id.* ¶¶ 17, 22; Dkt. No. 77 at 26 (Dhamers 30(b)(6) Dep. 72:21–23). Shelton’s briefing says L.D. was suspended for several days, Dkt. No. 75 at 8, but its principal’s declaration says the opposite and Shelton cites no record support. Dkt. No. 39 ¶ 6; *see also* Dkt. No. 77 at 26 (Dhamers 30(b)(6) Dep. 72:21–23).

**2.4 The September 20 reports and the stabbing.**

On the morning of September 20, 2021, Sundberg had a confrontation with two other students, H.R.W. and A.M. Dkt. No. 77 at 174–81. The three went to the main office, where Security Officer Nigel Warren had each of them write a "Handwritten Information Report." *Id.* Sundberg's report said that H.R.W. had called him gay and a "fag." *Id.* at 175. H.R.W.'s and A.M.'s reports said a group of students was harassing them and pressuring A.M. to fight another girl. *Id.* at 177–81.

Warren handed H.R.W.'s and A.M.'s reports to Bryz-Gornia, who met with the two students and completed an HIB form with them. *Id.* at 153–56 (Bryz-Gornia Dep. 54:1–55:2, 55:24–57:4). Though their reports named a group, Bryz-Gornia noted only Sundberg as a bully on the form. *Id.* at 157–58 (Bryz-Gornia Dep. 58:6–59:14); *id.* at 182–84. Asked why, he said he assumed the students had named Sundberg and that "there seems to be a pattern of behavior"; it was "not the first time that students are complaining about Mr. Sundberg." *Id.* at 157 (Bryz-Gornia Dep. 58:14–20). Sundberg's report stayed in Warren's office. Administrators did not have it until Warren delivered it on September 24, after Sundberg's mother asked Dhamers for it. *Id.* at 27–28 (Dhamers 30(b)(6) Dep. 89:24–90:4); *id.* at 186–90.

During third period, Sundberg went to his special-education teacher, Robin Clarey, and told her that H.R.W. had called him a "fag" or "faggot," adding: "If he says it one more time, I'm going to beat him up." *Id.* at 204, 212–14 (Clarey Dep. 25:6–8, 52:25–53:7, 56:17–23). Clarey told him to "avoid the situation." *Id.* at 213 (Clarey Dep. 53:8–11). She testified that she then walked him to Warren's office for

what she called a "soft handoff," and that she told Warren what Sundberg had said. *Id.* at 205, 214–15 (Clarey Dep. 26:8–15, 56:5–9, 56:17–57:11); Dkt. No. 81 at 34 (Clarey Dep. 55:14–25). Warren does not recall that conversation, and Sundberg denies that Clarey escorted him. Dkt. No. 75 at 10 n.4. Sundberg returned to Clarey's classroom during fourth period with the same complaint, this time reporting that H.R.W. had "pressed him." Dkt. No. 46 at 31; *see also* Dkt. No. 77 at 39 (Dhamers 30(b)(6) Dep. 152:12–17). No one completed a HIB form on any of these reports.

Just before fifth period, H.R.W. called Sundberg a "faggot" again. Dkt. No. 12 ¶ 5. Sundberg moved toward him, yelling "call me faggot one more time." Dkt. No. 46 at 6, 9, 11; Dkt. No. 77 at 206 (Clarey Dep. 33:9–20). The two fought. Dkt. No. 46 at 6. The altercation was captured on video. Dkt. No. 39-6. H.R.W. pulled a knife and stabbed Sundberg six times, including just below his left ear. Dkt. No. 12 ¶ 5; Dkt. No. 13 ¶ 2 (sealed). An emergency room physician who treated Sundberg testified that if the knife wound near his ear had been half an inch deeper, it would have lacerated his jugular or carotid arteries. Dkt. No. 14 at 16 (sealed).

**2.5 The aftermath.**

Shelton placed both students on emergency expulsion. Dkt. No. 39 ¶¶ 11–12. It converted Sundberg's to a 10-day suspension on September 27. *Id.* ¶ 12. During the suspension, his IEP team held a "manifestation meeting" and determined that the fight was a manifestation of his disability. Dkt. No. 77 at 209–11 (Clarey Dep. 38:10–19, 39:24–40:4). That determination entitled him to return to school as early

as the next day. Dkt. No. 77 at 49 (Dhamers 30(b)(6) Dep. 184:3–8). H.R.W.'s expulsion became a 48-day suspension; A.M.'s became a 10-day suspension. Dkt. No. 39 ¶¶ 10–11.

More information arrived in the days after the stabbing. Two students submitted written statements confirming that H.R.W. had yelled "shut up fag!" and "call[ed] Jayden a faggot." Dkt. No. 46 at 9, 11. H.R.W. posted online, "I'm good faggots can't hit hard." *Id.* at 21. And the principal of the district's alternative school emailed Bryz-Gornia and Dhamers that C.C. had gone to Shelton to fight L.D. because L.D. was "making fun of his friend, Jayden Sundberg," adding that "[t]here may also be a pattern of bullying towards Jayden based on sexual orientation[.]" *Id.* at 16. Bryz-Gornia agreed at deposition that this email should have triggered a HIB investigation. Dkt. No. 77 at 162–63 (Bryz-Gornia Dep. 69:6–70:15). None occurred. *Id.* at 34 (Dhamers 30(b)(6) Dep. 139:3–7) *see id.* at 164 (Bryz-Gornia Dep. 71:10–19).

Sundberg did not return to Shelton. A handwritten note from the September 30 manifestation meeting gives the first stated reason: "he is being sent back to his neighborhood school because he doesn't live in our school district." *Id.* at 193. Principal Bruce Kipper, testifying both individually and as Shelton's Rule 30(b)(6) designee, said the paperwork was "part of it," but that the decision was "based on Jayden's overall behavior on campus, not going to class, walking out of class whenever he wanted to," and on "his behavior of constantly being out of class, not responding" and feeling "he could do whatever he wanted to do." *Id.* at 122, 124 (Kipper Dep. 44:6–16, 47:5–14); *see also id.* at 108 (Kipper 30(b)(6) Dep. 27:6–21)

(adopting that testimony as the District's). Asked whether Sundberg would have been allowed to attend had his family submitted the transfer paperwork, Kipper answered: "That would be accurate" that he would not. *Id.* at 124 (Kipper Dep. 47:15–21). Kipper knew of no manifestation determination on those behaviors and of no document considering whether they were manifestations of Sundberg's disability. *Id.* at 123 (Kipper Dep. 46:5–20). H.R.W. had no documented disability. *Id.* at 44–45 (Dhamers 30(b)(6) Dep. 160:23–161:8). After time in the county juvenile detention center, he returned to Shelton High School for summer school in 2022. *Id.* at 47–48 (Dhamers 30(b)(6) Dep. 163:17–164:1).

## 3. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court views the evidence "in the light most favorable to the non-moving party." *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019) (citation modified). But a nonmovant can't rest on allegations; it must point to specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Cross-motions require the Court to consider the evidence submitted on both motions and to rule on each separately. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134, 1136 (9th Cir. 2001). When Shelton moves,

Sundberg need only show a triable issue. When Sundberg moves on an element he must prove at trial, the Court views the record for Shelton and grants the element only if no reasonable jury could find for Shelton on it. Rule 56 permits a court to decide "part of each claim," Fed. R. Civ. P. 56(a), and to treat a fact as established when it declines to grant all the relief a motion seeks, Fed. R. Civ. P. 56(g). The Washington Supreme Court has said the same about WLAD public-accommodation claims: the causation element "is strictly a question of fact," but the first three elements "are mixed questions of fact and law," and "where reasonable minds would not differ about them, a court could decide the presence or absence of the first three elements as a matter of law." *Fell v. Spokane Transit Auth.*, 911 P.2d 1319, 1328 (Wash. 1996).

Two more cautions apply. Summary judgment for a defendant is "seldom appropriate" in WLAD cases because discriminatory motive is hard to prove, *Scrivener v. Clark Coll.*, 334 P.3d 541, 545 (Wash. 2014), and the same is true of federal discrimination claims, *see Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 690–91 (9th Cir. 2017). That caution cuts against Shelton's motion. It cuts the other way, too, since the Court should not take from the jury an element that depends on why Shelton acted.

## 4. DISCUSSION

### 4.1 The IDEA's exhaustion requirement doesn't apply to Sundberg's ADA claim.

Shelton argues that Sundberg had to exhaust administrative remedies under the Individuals with Disabilities Education Act (IDEA) before suing under the

Americans with Disabilities Act (ADA). Dkt. No. 75 at 25–27. The Supreme Court has rejected that argument on these facts. The IDEA's exhaustion provision "applies *only* to suits that 'see[k] relief . . . also available under' IDEA," and "that condition simply is not met in situations like ours, where a plaintiff brings a suit under another federal law for compensatory damages—a form of relief everyone agrees IDEA does not provide." *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 147–48 (2023). Sundberg seeks only compensatory damages under the ADA. Dkt. No. 52 ¶ 6.10. Shelton's authorities look to whether the claim is tied to a student's IEP, Dkt. No. 75 at 26–27, but after *Luna Perez* the test turns on the relief sought, not the subject matter. Exhaustion is not required.

**4.2 Shelton's decision not to let Sundberg return.**

Sundberg's WLAD disability claim and his ADA claim both challenge Shelton's decision not to let him return to school (the exclusion). The elements overlap. Under the WLAD, he must show that (1) he has a disability, (2) Shelton is a place of public accommodation, (3) Shelton "discriminated against [him] when it did not treat [him] in a manner comparable to the treatment it provides to persons outside that class," and (4) his disability was a substantial factor causing the discrimination. *Floeting v. Grp. Health Coop.*, 434 P.3d 39, 41 (Wash. 2019) (citing *Fell*, 911 P.2d at 1328). Under Title II of the ADA, he must show that (1) he is a qualified individual with a disability, (2) he was excluded from participation in a public entity's services, programs, or activities, and (3) the exclusion was because of his disability. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). Damages

under Title II also require intentional discrimination, shown by deliberate indifference. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). Shelton concedes the first element of each claim and that it is a place of public accommodation. Dkt. No. 79 at 15.

**4.2.1 The undisputed record establishes that Shelton excluded Sundberg and treated him differently from a student without his disability.**

Shelton doesn't dispute that it decided Sundberg would not return. *Id.* at 22–23; *see also* Dkt. No. 77 at 121–22 (Kipper Dep. 43:24–44:5). Kipper testified that the residency paperwork made no difference: Sundberg would have been turned away either way. Dkt. No. 77 at 124 (Kipper Dep. 47:15–21). As the District's Rule 30(b)(6) designee, he adopted that testimony as the District's. *Id.* at 108 (Kipper 30(b)(6) Dep. 27:6–21). It binds the District. *See* Fed. R. Civ. P. 30(b)(6); *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 688–90 (S.D. Fla. 2012). Shelton points to a later conversation and email in which Kipper offered to meet with Sundberg's mother, Dkt. No. 79 at 12–13; Dkt. No. 82 at 3–4, and Sundberg disputes that account, Dkt. No. 83 at 2 n.1; Dkt. No. 84 ¶¶ 3–6. The Court needn't resolve that dispute. Whatever Kipper said to Sundberg's mother, his sworn testimony is that Sundberg would not have been readmitted. Dkt. No. 77 at 124 (Kipper Dep. 47:15–21). On this record, the only finding a reasonable jury could reach is that Sundberg was excluded from Shelton.

Nor could a jury find that Shelton treated Sundberg comparably to a student without his disability. H.R.W. had no documented disability. *Id.* at 44–45 (Dhamers

30(b)(6) Dep. 160:23–161:8). He stabbed Sundberg, spent time in juvenile detention, *and came back to Shelton*. *Id.* at 47–48 (Dhamers 30(b)(6) Dep. 163:17–164:1). Sundberg, whose conduct the IEP team found to be a manifestation of his disability, did not come back. *Id.* at 211 (Clarey Dep. 40:2–4); *see id.* at 121–22 (Kipper Dep. 43:24–44:2). Shelton's only answer is that it had good reasons. *See* Dkt. No. 79 at 22–23. That answer goes to why Shelton acted, which is the fourth element, not to whether the treatment was comparable. Under *Fell*, where reasonable minds could not differ, the Court may decide the first three elements. 911 P.2d at 1328. It does so here. Sundberg has established the first three elements of his WLAD disability claim, and the first two elements of his Title II claim, as to Shelton's decision not to let him return.

#### 4.2.2 Whether Shelton acted because of Sundberg's disability is for the jury.

Sundberg asks the Court to go one step further and find causation as a matter of law. Dkt. No. 76 at 16–18. His argument is strong. Kipper testified that Shelton excluded Sundberg for "not going to class, walking out of class whenever he wanted to," and for "not responding" to authority. Dkt. No. 77 at 122, 124 (Kipper Dep. 44:12–16, 47:9–11). Those are the behaviors the BIP describes as the targets and, in the case of leaving class, the prescribed replacement behavior for his disability: "rude attitude toward authority," refusing to "function with" a teacher or administrator until a conflict is resolved, and "walking away to a place where he is safe." *Id.* at 79. Under both federal and Washington law, "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis" for

adverse action. *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139–40 (9th Cir. 2001); *see Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1093 (9th Cir. 2007). And a substantial factor need not be the only factor. *See Scrivener*, 334 P.3d at 545. Shelton's opposition does not dispute that the behaviors Kipper described are linked to Sundberg's disability; it argues instead that it was entitled to act on them anyway. Dkt. No. 79 at 22–23.

Even so, the Court will not decide causation on summary judgment. The Washington Supreme Court has said that this element "is strictly a question of fact." *Fell*, 911 P.2d at 1328; *see also id*. at 1330. *Humphrey* and *Gambini* describe what a jury "could reasonably find" and what a jury "must be instructed that it may find," not what a court may decide for it. 239 F.3d at 1140; 486 F.3d at 1093. Shelton has offered a competing account of its motive—student and staff safety—and however thin that account looks against Kipper's testimony and the BIP, weighing it is the jury's job. The Court thus DENIES Sundberg's motion on the fourth WLAD element and the third Title II element. For the same reasons, and viewing the record for Sundberg, Shelton's motion on those elements fails—a jury could readily find that the District's stated reason was his disability.

#### 4.2.3 Shelton's justifications don't entitle it to summary judgment.

Shelton argues that it could exclude Sundberg because he posed a direct threat to the safety of others. Dkt. No. 75 at 20–21; Dkt. No. 79 at 22–23. It cites 42 U.S.C. § 12182(b)(3), RCW 49.60.215(2), *Ascani v. Hofstra Univ.*, 173 F.3d 843

(2d Cir. 1999), and *R.W. v. Columbia Basin Coll.*, No. 4:18-CV-5089-RMP, 2019 WL 13201975 (E.D. Wash. Oct. 21, 2019). None of this helps Shelton.

Start with the federal statute. Section 12182(b)(3) is part of Title III, which governs public accommodations operated by private entities. 42 U.S.C. § 12181(7). Sundberg sues under Title II, which governs public entities and contains no direct-threat provision. 42 U.S.C. § 12132. *Ascani* and *R.W.* involve colleges, and neither addresses a public school district's obligations to a child with an IEP. Those obligations are the point. "Congress very much meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school." *Honig v. Doe*, 484 U.S. 305, 323 (1988). The Supreme Court refused to read a "dangerousness" exception into the statute. *Id.* at 323–25. But it also explained that Congress "did not leave school administrators powerless"—a school may use its normal disciplinary tools, may suspend a student who poses an immediate threat for up to ten school days, may agree with the parents on an interim placement, and may ask a court for relief if it believes the student is too dangerous to remain. *Id.* at 323, 325–27. Shelton used none of those tools. It held a manifestation meeting, found that Sundberg's conduct was a manifestation of his disability, and then decided on its own that he would not come back. Dkt. No. 77 at 211 (Clarey Dep. 40:2–4); *see id.* at 121–22 (Kipper Dep. 43:24–44:2). Shelton does not argue otherwise; its briefing never responds to Sundberg's IDEA argument at all. *See* Dkt. Nos. 79, 82.

That answers RCW 49.60.215(2) as well. Whatever room that provision leaves for refusing service to a person whose behavior poses a risk, it cannot

authorize a public school to do what federal law forbids. Sundberg's exclusion without notice, a manifestation determination on the behaviors at issue, or any of the procedures Congress required was not a lawful refusal. And to the extent Shelton means to assert direct threat as an affirmative defense, it did not plead one. Fed. R. Civ. P. 8(c); *see D.W. v. Fresenius Med. Care N. Am.*, 534 F. Supp. 3d 1274, 1284–85 (D. Or. 2021) (direct threat is an affirmative defense on which the defendant bears a "heavy" burden). Shelton's first appearance of the theory is in its summary-judgment motion. That is too late.

Sundberg argues that Shelton's violation of the IDEA's procedures is itself disability discrimination. Dkt. No. 83 at 2. The Court, however, does not go that far. A plaintiff may not recover under Title II "simply by proving that the IDEA FAPE requirements were not met." *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1203–04 (9th Cir. 2016) (citation modified). But the procedural violation is powerful evidence. It shows that Shelton knew what the law required of it before excluding a student with an IEP and did not do it, and a jury may consider that in deciding both why Shelton acted and whether it acted with deliberate indifference.

**4.3 Shelton's handling of Sundberg's harassment reports.**

Sundberg's second theory is that Shelton applied its HIB policy differently to him than to other students—because he is gay, in violation of the WLAD, and because of his disability, in violation of the WLAD and Title II. Shelton moves for summary judgment on this theory under all three claims. Sundberg moves for summary judgment on the first three WLAD elements and the first two Title II

elements. The Court DENIES Shelton's motion and GRANTS Sundberg's only on the elements Shelton concedes.

**4.3.1 The comparable-treatment test governs the third element.**

The parties dispute how to state the third WLAD element. Shelton relies on *Floeting*, which asks whether the defendant treated the plaintiff "in a manner comparable to the treatment it provides to persons outside that class." 434 P.3d at 41; Dkt. No. 75 at 15. Sundberg relies on *State v. Arlene's Flowers, Inc.*, which lists the element as whether the defendant "discriminated against the plaintiff, whether directly or indirectly," and argues from it that a plaintiff need show only a denial of "full enjoyment," not different treatment. 441 P.3d 1203, 1220 (Wash. 2019); Dkt. No. 80 at 8–9.

*Floeting* states the test. The Washington Supreme Court adopted the comparable-treatment formulation in *Fell*, where it rejected—in response to the dissent—a proposed third element that "plaintiff was denied full enjoyment of the place of public accommodation." 911 P.2d at 1328 n.22. *Floeting* described *Fell* as "the standard for establishing a prima facie case of discrimination in a place of public accommodation under RCW 49.60.215" and applied it to a sexual-harassment claim, 434 P.3d at 41, and *W.H. v. Olympia School District*, 465 P.3d 322, 325 (Wash. 2020), quoted the same formulation the year after *Arlene's Flowers*. *Arlene's Flowers* did not construe the element; the defendant there contested only causation. 441 P.3d at 1220. The test is less demanding than Shelton suggests, though. It does not require a named comparator. *See Fell,* 911 P.2d at 1327–28.

The WLAD's broad definition of "full enjoyment" informs what counts as non-comparable treatment, *Floeting*, 434 P.3d at 42; the measure is objective—what "a reasonable person who is a member of the plaintiff's protected class, under the same circumstances, would feel," *id.* at 44 (citation modified); and on the disability claim the comparison is to a person "without that disability," *Hartleben v. Univ. of Wash.*, 378 P.3d 263, 266 (Wash. Ct. App. 2016). In any event, the result on both motions is the same under Sundberg's reading. The Court states the test now because the parties will need it at trial, not because the outcome here depends on it.

**4.3.2 The record presents triable issues.**

Viewed in Sundberg's favor, the record would let a jury find that Shelton handled his reports differently from everyone else's. When L.D.'s side of the September 14 incident reached Bryz-Gornia, he completed a HIB form naming Sundberg the bully within two days—on "no evidence," by his own admission. Dkt. No. 77 at 149 (Bryz-Gornia Dep. 49:8–12); *id.* at 171. When Sundberg reported the "fat, gay dude" comment on September 17, no form was completed and no one spoke to L.D. *Id.* at 24–25 (Dhamers 30(b)(6) Dep. 68:2–6, 70:8–19). On September 20, H.R.W. and A.M. completed a HIB form with an assistant principal before the fight, *id.* at 177, 179; Sundberg's report of a homophobic slur sat in the security office for four days. Sundberg then reported the slur twice more, to his special-education teacher and, through her, to the security officer, along with a warning that tracked his BIP. *Id.* at 205 (Clarey Dep. 26:3–15); Dkt. No. 46 at 31. Still no form. After the stabbing, two student statements, a social-media post, and a fellow principal's email

all pointed to a pattern of anti-gay harassment, and Bryz-Gornia agreed a HIB investigation was required. Dkt. No. 46 at 9, 11, 16, 21; Dkt. No. 77 at 163 (Bryz-Gornia Dep. 70:10–15). Still none. Shelton's designee testified that its policy gives staff no discretion on reports like these. Dkt. No. 77 at 106–07 (Kipper 30(b)(6) Dep. 20:23–21:3). A reasonable jury could find that Sundberg did not receive the treatment Shelton provides to students who are not gay and do not have his disability, and that a reasonable person in his position would have felt exactly that.

Shelton's arguments do not defeat that inference. It says it did not know the other students' sexual orientation and so could not have treated Sundberg differently on that basis. Dkt. No. 75 at 17 n.5, 19–20 n.7. But the WLAD asks whether Shelton acted because of Sundberg's orientation, which it knew, Dkt. No. 36 ¶ 9, and Sundberg has offered evidence that the other students were heterosexual, Dkt. No. 78 ¶¶ 4–7, which Shelton does not rebut. It says L.D. and A.M. were also disabled. Dkt. No. 75 at 17, 23; Dkt. No. 79 at 24. The record shows they had learning disabilities that affected their academics, not disabilities that affect emotional regulation, and H.R.W had none. Dkt. No. 77 at 42–46 (Dhamers 30(b)(6) Dep. 158:21–162:21). The comparison *Hartleben* calls for is to students without Sundberg's disability, and these students qualify. Shelton says a failure to follow its own policy is not discrimination. Dkt. No. 79 at 20. This is true as far as it goes, but repeated failures to follow a mandatory policy on reports from one student, alongside prompt compliance on reports against him, are evidence from which a jury may infer discrimination. Shelton says that on September 20 there was no reasonable opportunity to investigate before the fight, and that staff intervened by

having the students write reports and by counseling Sundberg. Dkt. No. 75 at 18–19, 24–25. That is Shelton's best argument, and a jury may accept it. But the September 17 report about L.D. sat for three days before the stabbing and was never acted on afterward. Dhamers testified that she did not ask for a HIB form because the report seemed "vague and secondhand," and that no one ever followed up with L.D. Dkt. No. 77 at 24–26 (Dhamers 30(b)(6) Dep. 68:2–12, 70:8–19, 72:17–23). Whether Shelton's inaction reflected the press of events or something else is for the jury. It says Sundberg was the least-disciplined student after both fights. Dkt. No. 75 at 18, 20. Sundberg's claim is about how Shelton handled his reports of harassment, not about how much discipline he received, and the two questions are distinct. Finally, Shelton says that Bryz-Gornia's September HIB form against Sundberg caused no "actual damages" because Sundberg was never disciplined for it. Dkt. No. 79 at 17–18. Under the WLAD, the injury inheres in the discriminatory act; damages are not a separate element of the prima facie case. *Negron v. Snoqualmie Valley Hosp.*, 936 P.2d 55, 59–60 (Wash. Ct. App. 1997). In any event, the form is one piece of evidence of differential treatment, not the whole claim.

The same record, viewed for Shelton, is why Sundberg's motion on this theory fails beyond the conceded elements. Shelton's account of September 20—hours between the reports and the fight, students separated and told to write statements, a security officer called away to another incident, a teacher twice urging Sundberg to stay put—is one a jury could credit. Whether the treatment Sundberg received was comparable to what other students received, and whether it was objectively discriminatory, are the mixed questions *Fell* leaves to the factfinder when

reasonable minds could differ. 911 P.2d at 1328. They could differ here. The Court also declines Sundberg's invitation to treat the slurs themselves as direct evidence of Shelton's motive under *Alonso v. Qwest Commc'ns Co., LLC*, 315 P.3d 610, 615–16 (Wash. Ct. App. 2013). Dkt. No. 80 at 7–8. In *Alonso*, the people who used and tolerated the slurs were the employer's own supervisor and employees. 315 P.3d at 614–15. Here they were students, and a student is not the District's agent. *See Floeting*, 434 P.3d at 44; *L.K.M. v. Bethel Sch. Dist.*, No. C18-5345 BHS, 2020 WL 7075209, at *13 (W.D. Wash. Dec. 3, 2020). What Shelton's employees did with Sundberg's reports is circumstantial evidence of motive, and it will go to the jury as such.

Accordingly, on the HIB theory the Court GRANTS Sundberg summary judgment on the first two elements of his WLAD sexual orientation claim, the first two elements of his WLAD disability claim, and the first element of his Title II claim—all of which Shelton concedes—and DENIES both motions on the remaining elements.

### 4.4 Intent under Title II is for the jury.

To recover damages under Title II of the ADA, Sundberg must prove intentional discrimination, which he may do by showing deliberate indifference—"knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall*, 260 F.3d at 1138–39. A public entity is on notice when the plaintiff has alerted it to the need for accommodation "or where the need for accommodation is obvious, or required by statute or regulation[.]" *Id.* at

1139. Deliberate indifference requires more than negligence or "bureaucratic slippage"; the failure to act must involve "an element of deliberateness." *Id.*

Shelton argues it cannot have been deliberately indifferent because Dhamers and Clarey were trying to help Sundberg. Dkt. No. 75 at 25; Dkt. No. 82 at 6–7. A jury may accept that for the HIB reports, though the repeated warnings on September 20 and the "soft handoff" that produced no form and no follow-up would let it find otherwise. The argument does little for the exclusion. Shelton had Sundberg's IEP and BIP. Dkt. No. 77 at 68–80. It knew a manifestation determination was required before removing him for disability-related conduct, because it held one for the fight. *See id.* at 123 (Kipper Dep. 46:12–14). It then excluded him for other conduct without holding another, and told his family he could return with paperwork that, by its own account, would have made no difference. *Id.* at 124 (Kipper Dep. 47:5–21). A jury could find Shelton knew what the law required and chose not to follow it. Whether it did is a question of state of mind, and competing accounts of a school district's knowledge present a factual dispute for trial.

Shelton's motion on intent is DENIED. Sundberg's request, first made in reply, that the Court find deliberate indifference as a matter of law, Dkt. No. 83 at 7 n.5, is DENIED for the same reason.

### 4.5 Shelton owed Sundberg a duty of care.

Sundberg moves for summary judgment on the duty element of his negligence claim, and Shelton does not oppose. Dkt. No. 79 at 2. Whether a duty exists is a

question of law. A school has a "special relationship" with the students in its custody and a duty to protect them "from reasonably anticipated dangers," including harm at the hands of other students. *Christensen v. Royal Sch. Dist. No. 160*, 124 P.3d 283, 287 (Wash. 2005) (citation modified). Sundberg was Shelton's student, and his BIP foresaw the very harm that occurred. The Court GRANTS summary judgment for Sundberg on the duty element. Breach, causation, and damages remain for trial.

**4.6 Shelton's second through fifth affirmative defenses are dismissed; its first survives.**

Sundberg moves to dismiss all five of Shelton's affirmative defenses. Dkt. No. 76 at 21–22. Shelton does not oppose dismissal of the second through fifth. Dkt. No. 79 at 2. Those defenses are DISMISSED.

Shelton does, however, defend its first affirmative defense—that Sundberg's injuries were caused by his own actions. *Id.* at 27. Sundberg argues that the defense is barred because Shelton itself determined that the fight was a manifestation of his disability, and that public policy should forbid charging a student with fault for conduct his school has classified that way. Dkt. No. 76 at 21; Dkt. No. 83 at 11–12. He relies on *Christensen*. 124 P.3d at 286–87.

The Court declines to extend *Christensen* this far. Contributory fault is available in negligence actions against school districts, RCW 4.22.005; *Hendrickson v. Moses Lake Sch. Dist.*, 428 P.3d 1197, 1206–07 (Wash. 2018), and *Christensen* carved out a narrow exception for a specific reason, finding that a 13-year-old "lacks the capacity to consent" to sexual abuse by her teacher, so her participation cannot

be fault. 124 P.3d at 288. That rationale concerns consent, and it does not translate to a fight between students. The manifestation determination is powerful evidence for Sundberg on this defense—a jury may well conclude that a student who reacted the way his own school predicted he would was not at fault—but it is evidence, not a legal bar. Sundberg's judicial-estoppel argument fails for the same reason because determining that conduct was a manifestation of a disability for IDEA discipline purposes is not the same as conceding the student bears no comparative fault for it.

The motion to dismiss the first affirmative defense is DENIED.

### 4.7 Sundberg's claims proceed on Shelton's own conduct, not on harassment imputed from other students.

Finally, Shelton asks the Court to hold, consistent with two earlier orders in this case, that the WLAD does not make a school district liable for one student's harassment of another. Dkt. No. 75 at 21–22; Dkt. No. 82 at 7; *see* Dkt. Nos. 18, 49. Sundberg asks the Court to allow him to proceed on the theory that a third party's harassment is imputed to a place of public accommodation that knows of it and fails to act. Dkt. No. 80 at 15–17.

*L.K.M.* separates the two theories, and so does the Court. There, a student with cognitive disabilities was sexually assaulted by another student. 2020 WL 7075209, at *1. She claimed the district discriminated against her in two ways: when the other student assaulted her, and when the district's employees did not apply its sexual-harassment policy to her. *Id.* at *13. The court dismissed the first theory because the perpetrator "was not an employee or agent of the District," reading *Floeting* to make an establishment liable for its agents' and employees'

discrimination but not for a stranger's. *Id.* (citing *Floeting*, 434 P.3d at 44). It sent the second theory to the jury, because whether the district's employees applied its policy to her comparably was a question of fact. *Id.* at *14.

The two earlier orders, entered before reassignment, addressed the first theory and treated *L.K.M.* as foreclosing it. Dkt. Nos. 18, 49. The Court adheres to those rulings: Sundberg may not recover under the WLAD on the ground that L.D.'s or H.R.W.'s slurs are themselves Shelton's discrimination. Sundberg's arguments from the statute's text and the Human Rights Commission's regulations have some force, but he cites no Washington decision adopting them, and the Court declines to do so here when the theory is unnecessary to any claim going to trial. Sundberg's surviving claims rest on what Shelton's own employees did—how they handled his reports, whom they labeled a bully, and whether they let him come back. Those are the District's acts. The earlier orders addressed only the imputation theory, and Shelton does not contend otherwise. To the extent Shelton's motion seeks dismissal of the claims "based upon the alleged harassment by fellow students," Dkt. No. 75 at 22, it is GRANTED as to the imputation theory and DENIED as to the claims described above.

## 5. CONCLUSION

Shelton's own testimony establishes that it excluded a student with an IEP, without the process federal law requires, for behaviors its own plan attributed to his disability. Whether it did so because of that disability, and with deliberate indifference, a jury must decide. Everything else Sundberg has proven as to the

exclusion, he has proven as a matter of law. How Shelton handled his reports of harassment is for trial in full.

Accordingly, the Court ORDERS as follows:

1. Shelton's motion for partial summary judgment, Dkt. No. 75, is DENIED, except that it is GRANTED as to the theory that other students' harassment is imputed to Shelton under the WLAD, as described in Section 4.7.
2. Sundberg's motion for partial summary judgment, Dkt. No. 76, is GRANTED IN PART and DENIED IN PART:
    a. As to Shelton's decision not to let Sundberg return, the first, second, and third elements of Sundberg's WLAD disability discrimination claim, and the first and second elements of his Title II claim, are ESTABLISHED. Causation and intent remain for trial.
    b. As to Shelton's handling of Sundberg's reports of harassment, the first and second elements of his WLAD sexual orientation claim, the first and second elements of his WLAD disability claim, and the first element of his Title II claim are ESTABLISHED. All other elements remain for trial.
    c. The duty element of Sundberg's negligence claim is ESTABLISHED.
    d. Shelton's second, third, fourth, and fifth affirmative defenses are DISMISSED.
    e. All other relief requested is DENIED.

3. Within FOURTEEN (14) days of this order, the parties must file a joint status report stating their availability for trial during the next six months and the number of trial days they expect to need.

Dated this 21st day of September, 2026.

Jamal N. Whitehead
United States District Judge